PERRY *v.* DETROIT UNITED RAILWAY.

1. Appeal—Assignments of Error.
    Where, on appeal, objection was made in oral argument to a part of the general charge of the trial judge, but the record failed to show an assignment of error, the objection was not considered.

2. Personal Injuries—Damages—Question for Jury.
    In an action for injuries to plaintiff, who had received, while a

passenger on a street car, an electric shock, for which no recovery was permitted, the evidence was sufficient to justify the court in submitting to the jury the question whether the spinal difficulty from which plaintiff suffered was not the result of the physical hurts, other than the electric shock, received on the occasion in question.

Error to Oakland; Smith, J. Submitted November 19, 1903. (Docket No. 139.) Decided January 26, 1904.

Case by William J. Perry against the Detroit United Railway for personal injuries. From a judgment for plaintiff, defendant brings error. Affirmed.

*Brennan, Donnelly & Van De Mark* and *James H. Lynch*, for appellant.

*O. M. Springer* and *Charles Engelhard* (*D. L. Davis*, of counsel), for appellee.

MOORE, C. J. The plaintiff recovered a judgment for injuries received while a passenger on a car belonging to defendant. The case is brought here by writ of error. Upon the oral argument, counsel for defendant called the attention of the court to a part of the general charge of the trial judge which he insists was error. We are unable to find, after a careful examination of the record, that an assignment of error was taken as to this portion of the charge.

In their brief counsel say:

"The error relied upon in this case is in the court's permitting the jury to take into account any damages which the plaintiff may be entitled to because of the injury indicated by the tenderness or sore spot on the spinal column. * * * The question which is propounded for determination in this appeal is this: Where the legs of the plaintiff are tramped upon, and the physical result is the impairment of the spinal column at the base of the brain, and there is no medical testimony showing that the injuries inflicted in this car might, could, or did produce the condition found there, can the jury infer that this spinal condition was due to the alleged injury to the legs?"

It is necessary here to make a brief statement of the
claim of plaintiff.   He was a passenger on the defendant's
road in the evening.   There was a noise under the car.
It was stopped, and the motorman got down as though to
fix the car.   Suddenly the controller burned out, making a
great flash of light and a loud noise.   The plaintiff was
sitting in the smoking compartment, near the partition
between that compartment and the principal compart-
ment of the car.   He claims the conductor became
greatly excited, and told everybody to get out of the
car; that plaintiff attempted to open the door between the
two compartments; that the conductor pushed him so that
his head and arm were driven through the glass in the
upper portion of the door; that when he extricated him-
self, and put his hand on the handle of the door, he
received an electric shock; that the conductor continued
to push him; and that, as a result, he was severely injured.
The circuit judge was of the opinion there could be no
recovery for injuries received by the electric shock.   His
charge in relation to that phase of the case was as follows:

" In this case the evidence is undisputed that the de-
fendant company has constructed and operated the car in
such a manner as to comply with the obligations of the
law relative thereto, and the plaintiff in this case is enti-
tled to no damages that he claims to have sustained by
reason of the alleged electric shock, and consequently the
jury cannot consider and take into account in any manner
any testimony as to the nervous condition, irritability,
sleeplessness, or loss of weight on the part of the plaintiff,
as claimed by the defendant in this case, if it came from
the electric shock."

With this feature of the case eliminated, it is said no
damages should have been allowed because of the tender-
ness or sore spot on the spinal column, or of nervousness
resulting therefrom, because no relation is shown between
that condition of the spine and the injuries received other
than from the electric shock.

We cannot agree with the counsel in this contention.
The plaintiff testified:

"I sat right opposite the door, with my back that way, and I stepped up to catch the door to slide it back, and, just as I did, the conductor ran against me, and I stepped up like that to open the door, and he ran against that shoulder and arm (indicating), and knocked my hand through the door, and head, and also raised a lump on my head, and at that time my right hand was on the door.
*   *   *

"Q. Now, will you describe all about the effects of this injury to your hand?

"A. Well, it was cut,—this artery was cut off,—and was bleeding, and the car was all in darkness, and it was some minutes before the car was lit up again; and then I asked if there was any person in the crowd that could stop the flow of blood; if they could, I wished they would do it. And the blood was spurting up like that (indicating). I presume it was spurting all around."

On the cross-examination he testified:

"Q. Do you know whether you opened the door, or whether somebody else opened it?

"A. Well, I was jammed through the glass, and jammed on my head and back, and backed out of there.

"Q. Did you open the door, or did you not?

"A. I don't know. No. Now, when I grasped that door with my right hand, the conductor ran against me. He was coming towards the vestibule door. There were others going down the aisle. *   *   *

"Q. When your arm was thrust through the door, or hand, what did you do then?

"A. My head was knocked through the glass, too, at the same time; the right side of my head, right there (witness pointing out). It went through the glass.

"Q. Well, then, after that, what did you do?

"A. Drawed it back out of there. I tried to shove myself, to get out of the broken glass, of course. I put my hand against the door, and shoved myself back, out of the broken glass. I backed out of where I was knocked in the broken glass. Then the door got opened. I couldn't swear I opened it or somebody else opened it, or, anyway the door got opened, and the conductor kept shoving me ahead of him down three or four seats, and tramped on me. I was on a slant over like that, and grabbing at the seats to keep from falling,

and he was tramping on the back of my legs. Yes, he finally did knock me down into the seat.''

His testimony as to what occurred was confirmed, at least in part, by other witnesses. He also testified that before the injury he always slept well nights, and was not nervous; that immediately following the injury he was troubled with sleeplessness and nervousness. In this he is confirmed by the testimony of his wife.

There seems to be no dispute, or at least the testimony of the doctors is, that the injury to the hand is permanent. Dr. Colvin testified in answer to the question, ''What did you find on the first examination outside of the injury to the hand?'' '' I found this tenderness on pressure of the spinal column just below the base of the skull.'' He also testified:

'' Just at the base of the skull, on the spinal cord, was a spot. There was some tenderness on pressure, that might indicate some inflammation of the covering of the cord, and an inflammatory process set up in the covering of the spinal cord somewhere about the base of the brain.

'' *Q*. Mr. Perry complained, doctor, that sometimes when he arose in the morning there would be a stiffness of the muscles in the side of the neck. Was there any connection between that and such a condition that you saw?

''*A*. Well, no; I don't know that would have much to do with the muscular condition.

'' *Q*. Did you see any difference in that spot, or that affliction of pain or a dull pain?

''*A*. Of course, an irritation of the spinal cord might produce a choking sensation in the throat, or might be produced by any particular condition.

'' *Q*. And it produced a symptom of pain?

'' *A*. It made a choking sensation.

'' *Q*. Not a dull pain?

'' *A*. It might produce pain, yes.

'' *Q*. It might produce pain?

'' *A*. Yes, sir.

'' *Q*. Now, doctor, is there any connection between the spot on the base of the skull and the wound on the hand, —I mean in any close connection?

''*A*. I don't think so.  *  *  *

" *Q.* Now, doctor, this tenderness that was indicated that you say indicated an inflamed condition of the spinal cord, state what such a condition is likely to develop into, if anything.

"*A.* It is not absolutely an inflammation of the spinal cord,—inflammation of the covering of the spinal cord, more particularly of the fluid, in between the fluid and the covering. There might be a tenderness that might be observed after a while, or it might harden. In case it should harden, the pressure on the cord there might produce paralysis."

On the cross-examination he testified:

"*Q.* Well, doctor, in your experience, if a man got cut on the thumb would you expect it to cause pain in the back?

"*A.* No, not at all; that is independent."

On the redirect examination he said:

"*Q.* Now, you say an injury to the spine you would not trace to the injury of the thumb?

"*A.* Not at all.

"*Q.* The injury that you found there to the spine,— might that be occasioned by a severe electric shock, or by a party being jammed about in the car?

"*A.* It might be produced by being jammed about, I should think, but a light shock would not produce that.

"*Q.* A light shock would not produce that?

"*A.* No, I don't think so.

"*Q.* But a severe shock might?

"*A.* Electricity, as a rule, does not leave any lasting effects."

Dr. Bell testified:

" *Q.* Yes; now, did you discover any cause for that condition, or what would it attach to, doctor?

"*A.* I did not discover any disease. No, there was no organic trouble, and he gave me the history of the injury. I did not find any other injury, or any other indication of an injury, on his person, save that on his thumb, and a soreness, or anything of that kind. I found traces in the spinal cord and tenderness in the back of the head here at the base of the skull, where the spinal cord and membranes and several vessels pass into the brain into this region here (doctor pointing out).

" *Q.* And did that, in your opinion, doctor, and from your knowledge and experience, did that have anything to do with his nervous condition?

"*A.* Oh, I decidedly think it did.

" *Q.* Did you form any other opinion as to the cause of that soreness that you found on the spinal cord?

"*A.* No, I could not trace it. I could not trace it to any diseased condition of the body,—to any organic disease.

" *Q.* State what would be the result of that sore spot on the spinal cord that you found there.

"*A.* Well, it would have a tendency to affect the nervous system in general."

We think an inference from this testimony, taken as a whole, that the condition of the spine caused the nervous trouble, and that the spinal difficulty resulted from the physical hurts received by the plaintiff on the night of the accident, other than the electric shock, is not an unwarrantable one. In any event, we think it made a proper question for the jury.

Judgment is affirmed.

The other Justices concurred.